UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

                    Plaintiff,

        v.

LEONEL MICHEL VARGAS,

                  Defendant.

No.  CR-13-6025-EFS

**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS**

    The first duty of government is the safety of its people—by Constitutional means and methods.  Technology, including the means for covert surveillance of individuals through the use of a hidden video camera that wirelessly transmits images to an offsite computer of a law enforcement officer, can be an important tool in investigating crime.  Here, in April and May 2013, law enforcement officers obtained permission from a utility company to install, and did install, a disguised video camera on a utility pole more than one hundred yards from Defendant Leonel Michel Vargas' rural eastern Washington home.  It continuously recorded activity in the front yard of Mr. Vargas' property for more than six weeks and transmitted those images to a law enforcement officer's computer.  This permitted the officer, when viewing live footage, to pan and zoom the camera and, when the officer was off duty, to record the footage for later viewing.  Mr. Vargas argues this constant surreptitious video viewing and recording of the activities at the front

ORDER - 1

1   of his home and yard violated his Fourth Amendment right to be free from

2   unreasonable search.   For that reason, he asks the Court to suppress

3   the evidence obtained as a result of this prolonged surreptitious video

4   viewing and recording.   The U.S. Attorney's Office (USAO) opposes

5   suppression, contending that the video feed simply permitted law

6   enforcement to remotely observe what any law enforcement officer could

7   have observed if he passed by Mr. Vargas' front yard on the public

8   gravel access road in front of Mr. Vargas' home.   After reviewing

9   relevant Fourth Amendment jurisprudence and applying such to the facts

10   here, the Court rules that the Constitution permits law enforcement

11   officers to remotely and continuously view and record an individual's

12   front yard (and the activities and people thereon) through the use of

13   a hidden video camera concealed off of the individual's property *but*

14   *only* upon obtaining a search warrant from a judge based on a showing of

15   probable cause to believe criminal activity was occurring.   The American

16   people have a reasonable expectation of privacy in the activities

17   occurring in and around the front yard of their homes particularly where

18   the home is located in a very rural, isolated setting.   This reasonable

19   expectation of privacy prohibits the warrantless, continuous, and covert

20   recording of Mr. Vargas' front yard for six weeks.   Mr. Vargas' motion

21   to suppress the evidence obtained as a result of the video feed is

22   granted.   The Court provides a more detailed articulation of the factual

23   circumstances and its ruling below.

24   **A.   Facts**

25      Mr. Vargas' home is located on Arousa Road: a gravel road in the

26   rural farmland area of Franklin County in eastern Washington.   Arousa

Road borders Mr. Vargas' front yard on the east; continuing eastward beyond Arousa Road is undeveloped land with sagebrush and other native plants. Mr. Vargas' driveway is located on the southern portion of his property, with a gate separating Arousa Road and the driveway. The driveway leads to a mixed gravel and dirt parking area and an open, detached parking structure, which was used to store items and park a car and a four-wheeled all-terrain vehicle (ATV). In addition to the gated driveway, a simple wire cyclone fence and a twenty-foot strip of natural vegetation separates Mr. Vargas' front yard from the gravel Arousa Road. Mr. Vargas' home sits approximately sixty feet west of Arousa Road: immediately to the east of the house is an approximate twenty-foot concrete patio, then approximately ten feet of grass and weeds, followed by twenty-five feet of a mixed dirt and gravel parking area, then twenty feet of undeveloped land with natural vegetation in which the cyclone fence is positioned, and then Arousa Road. The concrete patio was used to store adult and children bicycles, a barbeque, a cooler, a garbage-collection container, and other items. South of the driveway and parking structure is an orchard. The orchard also backs the home on its westerly side. North of Mr. Vargas' home is a partial cyclone fence and undeveloped land with sagebrush and other native plants; near the fence was a metal burn barrel. Given the home's setting and the elevation differences in the adjacent land, there are no structures other than those on Mr. Vargas' property that can be viewed from his front door. Other than the gravel Arousa Road which runs in front of Mr. Vargas' property, there is also a mixed dirt and gravel road, approximately 150 yards to the north of his property, which

is perpendicular to Arousa Road.  This is a rural, isolated location with very few vehicles using these roads.[1]

City of Kennewick Detective Aaron Clem, who is assigned to the Tri-Cities Violent Gang Task Force,[2] received information in September 2012 that Mr. Vargas was involved in drug distribution in the Tri-Cities area.  In April 2013, desiring to learn who Mr. Vargas was associating with at his home, Detective Clem requested permission from Task Force supervising agents to install a sophisticated video camera in a surreptitious manner so that activities in Mr. Vargas' front yard could be surveilled through electronic, remote means.  Permission was granted, and FBI technical agents worked with a local utility company to install a hidden video camera on a telephone pole.  The selected telephone pole is on the other side of Arousa Road from Mr. Vargas' home and is approximately 150 yards south of the home.  The land on which the telephone pole sits is at the crest of a hill to the south of Mr. Vargas' home; therefore, the telephone pole sits at a higher elevation than Mr.

---

[1]  The "lay of the land" can be discerned from the pictures offered at the suppression hearing and attached to the briefs, ECF Nos. 49 & 60, as well as the recorded video, ECF Nos. 71, 81, & 87.

[2]  The Task Force is comprised of law enforcement officers from the U.S. Marshals Service, the Federal Bureau of Investigation (FBI), the Drug Enforcement Agency, Benton and Franklin Counties Sheriff's Departments, and each of the Tri-Cities (Richland, Kennewick, and Pasco) City Police Departments.

ORDER – 4

Vargas' home.    The video camera was installed near the top of the telephone pole.    The video camera began operating April 4, 2013.

The video camera's silent feed was wirelessly transmitted to Detective Clem's computer in his office approximately twenty miles away. From his computer, Detective Clem could rotate and zoom the video camera's view.    Detective Clem usually aimed the video camera at Mr. Vargas' front yard; yet, Detective Clem could also remotely pan and zoom the camera so that he could focus on anything in the front yard, including the front door, items in the open parking structure, vehicles (and open trunks and doors), individuals, and surrounding area.    The video camera operated twenty-four hours a day and its feed was saved to an external hard drive connected to Detective Clem's computer.[3]    Although Agent Clem testified that the recording was continuous for this six-week period, there are segments on the hard-drive recording and the DVD that "jump" in time.    The Court is unsure whether these time jumps, which typically range from thirty minutes to two hours, are caused by a recording malfunction or whether law enforcement deleted these segments from the recording.

---

[3]    The external hard drive is ECF No. 81.    Also part of the record is a DVD spanning a two-hour interval on May 6, 2013, from the hard-drive recording, which shows Mr. Vargas and two other men engaging in target practice in the area between Mr. Vargas' home and the fence running parallel to Arousa Road. ECF No. 71.

1    The video camera did not have night vision, or infrared or heat-
2    sensing capabilities.  Once the feed was recorded, the recorded image
3    cannot be enlarged without distortion, but "still photographs" can be
4    taken from the video recording, some of which were used to support the
5    subsequent search warrant application, Supp. Hrg. Gov't Ex. No. 1, which
6    is discussed below.  There is no evidence that the video camera was used
7    to record what was occurring inside Mr. Vargas' home; however, the
8    technical abilities of the camera would have made it possible for
9    Detective Clem to zoom inside an open front door or an unobstructed
10   window.

11       When Detective Clem's work schedule permitted, he remotely watched
12   the "live" video feed on his computer.  However, often he needed to
13   watch the recorded video feed given that he did not remain at his office
14   computer twenty-four hours a day, seven days a week during the six-week
15   time period the wireless video feed was provided to his work computer.
16   While reviewing the recorded video feed from May 2, 2013, Detective Clem
17   observed Mr. Vargas walk from his backyard to the driveway area in the
18   front of his house and raise his hands while holding an object consistent
19   with a firearm.  Detective Clem believed, based on Mr. Vargas' stance
20   and hand positioning, that Mr. Vargas was engaging in target practice
21   with a pistol.

22       On May 6, 2013, Detective Clem remotely observed, through the live
23   video-camera feed, Mr. Vargas arrive home and greet two males who were
24   waiting in his front yard.  The three men socialized and drank in the
25   front yard under the shade of a large tree.  After a while, Mr. Vargas
26   placed what appeared to be a glass beer bottle on top of a wooden fence

post — part of the fence that parallels Arousa Road. The men, including Mr. Vargas, took turns engaging in target practice by using a firearm to shoot at the bottle. Detective Clem used his computer controls to zoom and pan the video camera to focus on the individuals' faces, hands, and conduct during the target practice. Because of the camera's zooming capabilities, Detective Clem observed what appeared to be a silver semi-automatic pistol of unknown caliber. Detective Clem also observed what appeared to be recoil from the pistol and smoke leaving the pistol's barrel. Later Mr. Vargas retrieved a rifle from the direction of his house, and the men continued to take turns engaging in target practice, now with the rifle. The location is so remote that the video recorded one of the men urinating at the side of the front yard near the cyclone fence fifteen feet from Arousa Road, presumably confident that he would not be observed.

The recording for May 6 later jumps from 3:56 p.m. to 4:45 p.m.; as a result, there is no recorded video for approximately forty-five minutes. When the recording resumes at 4:45 p.m., two other vehicles and two other men are present. The men continued socializing but no target practice occurred in the presence of these two recently arrived men. After some time, the two recently arrived men leave in a single vehicle. Because the recording does not contain the segment of time when these two "new" vehicles arrive, it is unknown to the Court as to whom arrived in the other "new" vehicle. However, it appears that the driver of that vehicle went into the house and did not socialize with Mr. Vargas and the others outside. Following the departure of these two new men, target practice resumes by the three men who were initially

present.    Later that evening, those three men, including Mr. Vargas,

enjoy a bonfire in the nearby burn barrel.

Based on his review of Mr. Vargas' prior contacts with law

enforcement, Detective Clem suspected that Mr. Vargas was residing

unlawfully in the United States.    Detective Clem spoke to U.S.

Immigration and Customs Enforcement agents, who also believed that Mr.

Vargas was in the United States unlawfully.    On May 14, 2013, Detective

Clem applied for a search warrant based on Mr. Vargas' suspected

violation of 18 U.S.C. § 922(g)(5): being an alien in possession of a

firearm.    A federal magistrate judge issued a search warrant later that

day for evidence of crime and contraband in Mr. Vargas' home and

outbuildings.    On May 16, 2013, the Task Force executed the search

warrant at approximately 6:00 a.m.    During the search, four firearms

were found, as well as baggies containing 5 grams of a white crystal

substance that field tested presumptive positive for methamphetamine.

On the day that Detective Clem applied for the search warrant, he

also requested that the FBI technical agents turn off the video camera

feed.    Detective Clem testified that he was unsure when the video camera

was physically removed.    Yet, the recording shows on May 16, 2013, at

4:45 a.m. (approximately one hour before the search warrant was

executed) that the video camera's lens was shifted (presumably remotely)

so that only the sagebrush field to the east of home was in view.    At

10:50 a.m., the video camera's lens was shifted back (presumably

remotely) so that Mr. Vargas' home and front yard was in its view again.

Law enforcement apparently finished executing the search warrant by that

time as law enforcement officers are not seen on Mr. Vargas' property

1    when the video camera's lens shifts back to Mr. Vargas' property.  The

2    recording contains footage until approximately 8:00 a.m. on May 17,

3    2014.

4         On May 16, 2013, a criminal complaint was filed in this District

5    charging Mr. Vargas with violating 18 U.S.C. § 922(g)(5) (alien in

6    possession of a firearm) and 21 U.S.C. § 841(a)(1) (intent to distribute

7    5 grams or more of actual meth).  ECF No. 1.  On May 22, 2013, an

8    Indictment was filed, charging Mr. Vargas with these same crimes.  ECF

9    No. 12.

10        Believing that the evidence obtained as a result of the video

11   camera's surreptitious viewing and recording of the on-goings in his

12   front yard for six weeks violated his Fourth Amendment right to be free

13   from unreasonable search, Mr. Vargas filed a motion to suppress the

14   evidence obtained as a result of the video camera.  ECF No. 47.  The

15   Court held an evidentiary hearing on the opposed suppression motion on

16   February 11, 2014, ECF No. 72, and permitted the Electronic Frontier

17   Foundation (EFF) to submit amicus curiae arguments, ECF Nos. 55 & 63.[4]

18   Following the hearing, the Court invited supplemental briefing.  ECF

19   Nos. 76, 86, 93, & 97.  The Court also requested the USAO provide

20   Defendant and the Court with technical details regarding the video

_____

23   [4] Mr. Vargas was present at the pretrial conference, represented by John

24   Matheson.  Alexander Ekstrom appeared on behalf of the USAO.  Hanni

25   Fakhoury and Robert Seines appeared on the EFF's behalf.  The Court heard

26   testimony from Detective Aaron Clem.

camera and associated technology (collectively, "video camera").  The

USAO expressed concern regarding disclosing details about the video

camera, contending that such information is protected by the law-

enforcement privilege.  As explained below, the Court determines it need

not learn further details of the technological capabilities of the video

camera, or ascertain whether the law-enforcement privilege protects such

information, under these circumstances.

## B.    Analysis

Law enforcement may collect information to aid its investigations,

but law enforcement's conduct is limited by the Fourth Amendment.

*Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013).  The Fourth Amendment

protects "[t]he right of people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures."  U.S.

Const. amend. IV.  It is a basic principle of Fourth Amendment law that

searches and seizures without a warrant are presumptively unreasonable.

*See, e.g., Riley v. California*, 134 S. Ct. 2473, 2494-95 (2014); *Groh*

*v. Ramirez*, 540 U.S. 551, 559 (2004).  How the Fourth Amendment applies

to protect the people's right to be free from unreasonable search and

seizure is a matter of continuous public and legal scrutiny, especially

with the evolution of new technologies and their use by law enforcement.[5]

---

[5]  Recent polls indicate that many Americans are concerned with the oversight

that presently applies to government surveillance programs.  *See* Emily

Swanson*, Poll: NSA Oversight is Inadequate, Most Americans Say*, Huffington

Post, Aug. 27, 2013, *available at*

http://www.huffingtonpost.com/2013/08/17/nsa-oversight-poll_n_3769727.html;

*Riley*, 134 S. Ct. at 2484 (recognizing that flip phone and smart phones are "based on technology nearly inconceivable just a few decades ago"). "The police, of course, are entitled to enjoy the substantial advantages this technology confers.  They may not, however, rely on it blindly. With the benefits of more efficient law enforcement mechanisms comes

---

Frank Newport, *Americans Disapprove of Government Surveillance Programs*, GALLUP Politics, June 12, 2013, *available at* http://www.gallup.com/poll/163043/americans-disapprove-government-surveillance-programs.aspx. *See also* Adam Schwartz, *Chicago's Video Surveillance Cameras: A Pervasive and Poorly Regulated Threat to Our Privacy*, 11:2 Nw. J. Tech. & Intell. Prop. 2, 47 (Jan. 2013) (discussing privacy concerns with government use of cameras even in public spaces, and recommending that the government notify the public as to where a camera is located); The Editorial Board, *The President on Mass Surveillance*, N.Y. Times, Jan. 17, 2014, *available at* http://www.nytimes.com/2014/01/18/opinion/the-president-on-mass-surveillance.html?module=Search&mabReward=relbias%3Ar%2C%5B%22RI%3A8%22%2C%22RI%3A13%22%5D ("The president announced important new restrictions on the collection of information about ordinary Americans, including the requirement of court approval before telephone records can be searched.  He called for greater oversight of the intelligence community and acknowledged that intrusive forms of technology posed a growing threat to civil liberties."); *Surveillance of Citizens by Government*, N.Y.Times, *available at* http://topics.nytimes.com/top/reference/timestopics/subjects/s/surveillance_of_citizens_by_government/index.html (organizing commentary and archival articles regarding surveillance of citizens by the government).

1  the burden of corresponding constitutional responsibilities." *Arizona*

2  *v. Evans*, 514 U.S. 1, 17-18 (1995) (O'Connor, J., concurring).

3       The Supreme Court's recent decisions in *United States v. Jones*,

4  132 S. Ct. 945 (2012), and *Florida v. Jardines*, 133 S. Ct. 1409 (2013),

5  discuss and clarify the Fourth Amendment analysis the Court is to employ

6  when analyzing the constitutionality of a search conducted by law

7  enforcement.   To determine whether an unreasonable search occurred, a

8  court considers two Fourth-Amendment approaches: 1) whether a trespass

9  by law enforcement occurred (property-based approach), and/or 2) whether

10  an individual's reasonable expectation of privacy was violated by law

11  enforcement (reasonable-expectation-of-privacy approach).   *Jones*, 132

12  S. Ct. at 951 & 953.

13       The property-based approach does not apply here.   Law enforcement

14  did not physically enter Mr. Vargas' land or home until after it obtained

15  a search warrant based on the information learned from the video camera.

16  And law enforcement did not gain access to Mr. Vargas' wireless service

17  or other digital property to covertly record and transmit the activities

18  in the front yard.   The video camera did "intrude" upon Mr. Vargas'

19  front yard and the vehicles contained therein by recording the incidents

20  occurring thereon or items contained therein; however, the camera itself

21  was not on Mr. Vargas' land but rather on a telephone pole on another's

22  land, to which law enforcement had obtained permission to install the

23  camera.   For these reasons, a physical trespass did not occur.   *See*

24  *Jones*, 132 S. Ct. at 953 ("Situations involving merely the transmission

25  of electronic signals without trespass . . . *remain[s]* subject to" a

26  reasonable-expectation-of-privacy approach.).

The reasonable-expectation-of-privacy approach requires the Court to assess whether 1) Mr. Vargas had an actual (subjective) expectation that the activities in his front yard would be private, and 2) "'society is prepared to recognize [his subjective expectation of privacy] as reasonable.'" *United States v. Lopez-Cruz*, 730 F.3d 803, 807 (9th Cir. 2013) (internal citations removed). Accordingly, the Court's analysis focuses on whether Mr. Vargas had a reasonable expectation of privacy to not have his front yard continuously observed and recorded for six weeks by a camera with zooming and panning capabilities hidden on a telephone pole over a hundred yards away, and whether his subjective expectation of privacy is objectively reasonable. *See id.* The Court finds the answer to both of these questions is clear:  society expects that law enforcement's continuous and covert video observation and recording of an individual's front yard must be judicially approved, and Mr. Vargas' conduct during the six weeks that his front yard was covertly observed and recorded indicates that he expected not to have his front yard covertly observed and recorded on a continuous basis by law enforcement.

The parties' and EFF's arguments, concerning the subjective and objective reasonable expectations of privacy, include analysis of whether Mr. Vargas' front yard is part of his home's curtilage or an "open field."  Given the invasive nature of the employed continuous video surveillance, the Court rules that the Fourth Amendment analysis here is not controlled by whether Mr. Vargas' front yard is or is not part of his home's curtilage.  *See Riley*, 134 S. Ct. at 2490-91 (assessing the pervasiveness of the intrusion on one's privacy when

searching cell phones).  Yet to provide a thorough analysis of all issues addressed by the parties, the Court proceeds to analyze curtilage and "open field" principles to the facts of this case.

Typically, an individual has a reasonable expectation of privacy to his curtilage: the area immediately surrounding his home that "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *United States v. Dunn*, 480 U.S. 294, 300 (1987); *see also Jardines*, 133 S. Ct. at 1414 ("At the [Fourth] Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961))).  Four factors assist with assessing whether an area is within the curtilage: 1) the area's proximity to the home, 2) whether the area is enclosed, 3) the uses for that area, and 4) the steps taken by the resident to protect the area from observation by a passerby.  *Dunn*, 480 U.S. at 301. These factors do not complete the curtilage assessment but rather "are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration — whether the area in question is so intimately tied to the home itself that it should be" protected by the Fourth Amendment.  *Id*.

While a person typically has a reasonable expectation of privacy to his curtilage, an individual has no reasonable expectation of privacy in an "open field," the area outside of a home's curtilage.  *Oliver v. United States*, 466 U.S. 170, 179 (1984) ("[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home [the

curtilage].").  "An open field need be neither 'open' nor a 'field' as those terms are used in common speech.  For example . . ., a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment."  *Id.* at 180, n.11.

After assessing each of the *Dunn* factors, the Court concludes Mr. Vargas' front yard is part of his home's curtilage.  First, the front yard is immediately adjacent to the house.  Second, the front yard is fenced on the east and includes a gated driveway.  Although the front wire cyclone fence, which is supported by wooden and metal posts, does not substantially obstruct a passerby's view, a passerby's view of the front yard is hindered to some degree by the sagebrush, trees, and other native plants, which are in the front yard and which line the fence. Furthermore, there is a slight embankment between Arousa Road and the front yard.  The open parking structure provides a southern obstacle, and the house provides a western barrier.  As to the third *Dunn* factor, Mr. Vargas and those he lived with used their front yard for "backyard purposes": to barbeque, socialize with guests, and target practice.  In addition, the household used the front yard to park cars and the ATV, store adult and children's bikes, and hold the garbage-collection container and a burn barrel.  The USAO argues that target practice is not an intimate activity associated with the sanctity of Mr. Vargas' home and the privacies of life.  However, the Court must view this activity in the context of the home's setting—a rural locale off a gravel road—and in light that the target practice was an activity engaged in by three men as they relaxed and socialized in the shade of the tree in Mr. Vargas' front yard.    The relaxed nature of this

gathering, and the expectation that it was a private activity, is underscored by the fact that one of the men urinated near the cyclone fence, approximately fifteen feet from Arousa Road.  The Court finds under these circumstances that the act of engaging in target practice in the front yard is consistent with the Court recognizing the front yard as part of the home's curtilage.  As to the last *Dunn* factor (the steps taken by the resident to protect the area from observation by a passerby), Mr. Vargas selected to live in a home in a rural setting off a gravel road with trees, fencing, and a gated driveway.

Accordingly, after considering these four factors, amongst the totality of the circumstances, the Court finds Mr. Vargas' front yard is part of his home's curtilage.  *See Jardines*, 133 S. Ct. at 1414-15 (recognizing that the home's front porch was part of the curtilage even though it was not enclosed or gated, and could be seen from the road).  Mr. Vargas' front yard was separated from the gravel Arousa Road by a fence and gated driveway; Mr. Vargas also enjoyed a sense of enclosure in his front yard due to the parking structure, northern fence, and the natural vegetation and elevation change near the eastern fence; and Mr. Vargas did not affirmatively draw the public onto his property.  *Cf. United States v. Duenas*, 691 F.3d 1070, 1081 (9th Cir. 2012) (finding the non-enclosed front yard was not part of the curtilage as there was no evidence regarding the uses for the non-enclosed front yard); *United States v. Bausby*, 720 F.3d 652, 656 (8th Cir. 2013) (finding a chain-link-fenced front yard was not part of the curtilage because the defendant took affirmative steps to draw the public into his front yard by displaying items for sale); *United States v. Anderson-Bagshaw*, 509

Fed. Appx. 396, 404-05 (6th Cir. 2012) (unpublished opinion) (distinguishing between three areas outside the home, finding the backyard, which was in immediate proximity to the house and was fairly enclosed by trees, a fence, and a barn, and contained a picnic table and clothesline, was part of the curtilage, and finding the pasture and barnyard were outside of the curtilage). Accordingly, the Court finds the front yard is part of the home's curtilage. However, as mentioned above, the Court's finding of curtilage is not essential to the Court's finding that law enforcement's constant video-camera surveillance of Mr. Vargas' front yard for six weeks is an unreasonable search given that Mr. Vargas reasonably expected that his private activities in his front yard would not be subject to such constant, covert surveillance.[6]

The Court so rules while recognizing that law enforcement is not barred from making "plain view" observations of a home's curtilage. "The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an

---

[6] Given the reasonable expectation of privacy that Mr. Vargas possessed to his front-yard activities, the question of whether he possesses a privacy interest in his "personal curtilage" need not be addressed. *See* Andrew Ferguson, *Personal Curtilage: Fourth Amendment Security in Public*, 55 Wm. & Mary L. Rev. 1283, 1345-48 (April 2014) (discussing the need for Fourth Amendment jurisprudence to recognize a privacy right to one's personal curtilage, especially given the pervasive use of public surveillance by video cameras).

individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." *California v. Ciraolo*, 476 U.S. 207, 213 (1986).

The permitted "plain view" observations in *Ciraolo*, however, are much different from law enforcement's electronic, continuous remote surveillance here. In *Ciraolo*, the Supreme Court analyzed "whether naked-eye observation of the curtilage[, *i.e.*, a fully-fenced backyard,] by police from an aircraft lawfully operating at an altitude of 1,000 feet violates an expectation of privacy that is reasonable." *Id.* at 213-14. The Supreme Court held no, highlighting that any member of the public flying in the airspace above the defendant's home could have seen the marijuana in the backyard, and therefore defendant's expectation that his garden would not be observed was unreasonable and not an expectation that society is prepared to honor. *Id.*

The same day as *Ciraolo*, the Supreme Court decided *Dow Chemical Co. v. United States*, 476 U.S. 227 (1986). In *Dow Chemical*, the Supreme Court determined "the open areas of an industrial plant complex with numerous plant structures spread over an area of 2,000 acres are not analogous to the 'curtilage' of a dwelling for purposes of aerial surveillance; such an industrial complex is more comparable to an open field and as such it is open to the view and observation of persons in aircraft lawfully in the public airspace immediately above or sufficiently near the area for the reach of cameras." *Id.* at 240.

Yet, the Supreme Court took the opportunity to note in *Dow Chemical*, "this is *not* an area immediately adjacent to a private home,

where privacy expectations are most heightened." *Id.* at 237, n.3.  This comment by the Supreme Court in *Dow Chemical* is interesting given its same-day ruling in *Ciraolo*: law enforcement's naked-eye observation of marijuana in one's back yard did not constitute a Fourth Amendment violation.  The Supreme Court's comment in *Dow Chemical* indicates that *Ciraolo* may have been decided differently if law enforcement's observations included more than a one-time naked-eye observation of defendant's backyard.

In 2011, the Ninth Circuit commented on plain-view curtilage observations by law enforcement in *United States v. Perea-Rey*, 680 F.3d 1179 (9th Cir. 2011).  In *Perea-Rey*, the Ninth Circuit determined a carport within the fenced front yard and adjacent to the house was part of the curtilage and therefore the officers violated the defendant's Fourth Amendment right by entering the curtilage without a warrant.  While *Perea-Rey* involved a physical trespass by the officers, the Ninth Circuit commented, "a warrant is not required to observe readily visible items within the curtilage, and 'officers [need not] *shield their eyes* when passing by a home on public thoroughfares." *Id.* at 1186 (emphasis added).  The Ninth Circuit highlighted that therefore law enforcement can use what they actually saw from a public vantage point, such as a sidewalk, in a warrant application.  *Id.*

Based on this Fourth Amendment jurisprudence, there is no question that, if Agent Clem had personally watched Mr. Vargas possess a firearm in his front yard, when either passing by on Arousa Road, flying above Mr. Vargas' property on a one-time occasion, or sitting on the telephone pole with a camera and telephoto lens, Agent Clem's observation would

not constitute a search, and therefore, he could use such observation as a basis for a search warrant.  Although having an agent sit on top of a telephone pole may seem far afield, it is consistent with Justice Scalia's "constable" example in *Jones*, 132 S. Ct. at 950, n.3.  In *Jones*, Justice Scalia posits that a constable could conceal himself in a suspect's coach in order to track the movements of the coach, thereby serving as an 18th century global-positioning-system (gps) device.

Here, it may have been possible for law enforcement agents to take turns personally observing Mr. Vargas' activities in his front yard for a thirty-day period but the success of such hypothetical constables going unnoticed by Mr. Vargas for thirty days is highly unlikely.  *See Nerber*, 222 F.3d at 604 (recognizing that people modify their behavior when they are in the presence of others).  Nevertheless, the Court is limited to the facts before it, which do not include constables sitting on the telephone pole.  Rather Agent Clem only had the information pertaining to Mr. Vargas' May 2 and 6, 2013 target practices because of the live and recorded view afforded by the video camera, which was covertly installed approximately thirty days prior to these events. This "view" is so different in its intrusiveness that it does not qualify as a plain-view observation.

"Hidden video surveillance is one of the most intrusive investigative mechanisms available to law enforcement.  The sweeping, indiscriminate manner in which video surveillance can intrude upon us, regardless of where we are, dictates that its use be approved only in limited circumstances."  *Nerber*, 222 F.3d at 600.  Although law enforcement is permitted to use technology to enhance investigative

abilities, *see Ciraolo*, 476 U.S. at 215, law enforcement's video surveillance of Mr. Vargas' front yard for six weeks with a camera that could zoom and record violated his reasonable expectation of privacy: an expectation that society is prepared to recognize as reasonable.[7]

Continuous video surveillance of an individual's front yard "provokes an immediate negative visceral reaction: indiscriminate video surveillance raises the specter of the Orwellian state." *United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987) (permitting thirty days of video surveillance from a pole camera which recorded defendant's backyard only because law enforcement had obtained a warrant to do so); *see also Nerber*, 222 F.3d at 603-04 (suppressing in part evidence obtained from a video camera installed in a hotel room because, although the defendants did not rent the room, they had a legitimate expectation of privacy when they were in the room by themselves); *United States v. Taketa*, 923 F.2d 665, 673-74 (9th Cir. 1991) (suppressing video footage of federal employees in their offices because it violated the Fourth Amendment as they had a legitimate expectation of privacy not to be continuously recorded by a hidden ceiling camera in their office); *Shafer v. City of Boulder*, 896 F. Supp. 2d 915, 930-32 (D. Nev. 2012) (finding, in the context of a 42 U.S.C. § 1983 lawsuit, that the use of

---

[7]    *Cf.* Marc Blitz, *The Fourth Amendment Future of Public Surveillance: Remote Recording and Other Searches in Public Places*, 63 Am. U. L. Rev. 21, 84-86 (Oct. 2013) (recommending that Fourth Amendment analysis pertaining to public surveillance focus on whether a recording was generated and reviewed by law enforcement).

a video camera on a neighbor's property to film the plaintiff's backyard for fifty-six days constituted a search as the plaintiff had a reasonable expectation that his home would not be subject to unwarranted government video surveillance).  This dragnet law enforcement practice is not akin to either a naked-eye observation or a photographic picture by a live officer.[8]  *See United States v. Knotts*, 460 U.S. 276, 284

---

[8]  The use of drones by law enforcement is another investigative practice that deviates greatly from "traditional" law enforcement investigative practices.  Many states have adopted legislation to control the use of drones because a drone's ability to constantly and covertly view and record an individual or setting infringes on the American public's reasonable expectation of privacy that they will not be constantly and covertly observed by the government without a warrant.  While seeking to protect this reasonable expectation of privacy, the drone legislation permits law enforcement to seek a judicial warrant to utilize a drone for investigative purposes; or under limited exceptions, which are similar to the warrant exceptions developed under Fourth Amendment case law, the legislation permits law enforcement to use a drone for investigative purposes without a warrant in order to counter a specific terrorist attack or prevent specific imminent danger to life or property.  *See* Judge C. Philip Nichols, *Drones: The Coming of Age of a Not-So-New Technology*, 53 ABA: The Judge's Journal 4 (2014) (summarizing thirteen state's enacted drone legislation); Y. Douglas Yang, *Big Brother's Grown Wings: The Domestic Proliferation of Drone Surveillance and the Law's Response*, 23 B.U. Pub. Int. L.J. 343, 365 (Summer 2014) (discussing the different state's legislative response to the use of drones).  *See also* George Blum, Romualdo Eclavea, Alan Jacobs, and Eric Surette, 68 Am.

ORDER - 22

1   (1982) (noting "if such dragnet type law enforcement practices . . .

2   should eventually occur, there will be time enough then to determine

3   whether different constitutional principles may be applicable").

4   Electronic surveillance by the government is increasing, and the need

5   to balance this government tool with the Fourth Amendment is required.

6   *See Riley*, 134 S. Ct. at 2484-85 (assessing the degree to which the

7   search intrudes on an individual's privacy and the degree to which the

8   search is needed to promote legitimate governmental interests).

9       Here, the Fourth Amendment permits the type of electronic

10  surveillance employed only if a warrant[9] supported by probable cause is

11  _____

12  Jur. 2d Searches and Seizures § 114 (Nov. 2014) (discussing the case-law

13  exceptions to the Fourth Amendment's warrant requirement).

14  [9]  Not only has technology eased law enforcement's investigative abilities

15  but technology has also expedited law enforcement's ability to obtain a

16  warrant. *See Missouri v. McNeely*, 133 S. Ct. 1552, 1561-62 (2013) (observing

17  that technology now "allow[s] for the more expeditious processing of warrant

18  applications," and citing state statutes permitting warrants to be obtained

19  "remotely through various means, including telephonic or radio communication,

20  electronic communication . . ., and video conferencing")); *see also* Admin.

21  Office of the U.S. Courts, Table S-17: Matters Disposed of by U.S. Magistrate

22  Judges During the 12-Month Periods Ending September 30, 2004, and September

23  30, 2009 Through 2013, *available at*

24  http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2013/tables/S17S

25  ep13.pdf (showing an 83% increase in search warrant applications between 2004

26  and 2013); Admin. Office of the U.S. Courts, Wiretap Report 2012 (2012),

    *available at* http://www.uscourts.gov/Statistics/WiretapReports/wiretap-

obtained because society recognizes Mr. Vargas' subjective expectation of privacy in his front yard as a reasonable expectation of privacy.[10] And given the setting, Mr. Vargas reasonably believed that his front-yard activities would be private.  Mr. Vargas chose to live in a rural area: an area mixed with farmland and undeveloped, sagebrush land.  His rural home sits off a gravel road, and his front yard has a sense of enclosed space given a gated driveway and cyclone fence separating it from the gravel road.  The USAO argues that any passerby could have seen Mr. Vargas' conduct.  However, the setting of Mr. Vargas' home does not make the likelihood of a passerby likely: the road is gravel, his neighbors are "country neighbors," *i.e.*, they live a distance away, and there are no public sidewalks.  In addition, Mr. Vargas could hear a vehicle coming down the gravel road and modify his behavior, *i.e.*, target practice would cease.  *See Nerber*, 222 F.3d at 604 ("People feel comfortable saying and doing things alone that they would not say or do

_____

report-2012.aspx (comparing 3,397 wiretap applications in 2012, with 1,359 wiretap applications in 2002; with approximately 99%of the wiretap applications being granted in those years).

[10] A warrantless video search and recording by law enforcement for a limited period of time based merely on reasonable suspicion may be consistent with *Terry v. Ohio*, 392 U.S. 1 (1968).  Yet, here, law enforcement's continued use of the covert video recording clearly exceeded *Terry*: a warrant was required.  This also is not a case involving officer safety or the use of a recording device activated by a law enforcement officer during a *specific* encounter at which the officer was present.

ORDER - 24

in the presence of others."). In fact, the recording shows that Mr. Vargas ceased target practice in the presence of the two new individuals. Even if Mr. Vargas could not expect total privacy in his rural front yard, "this diminished privacy interest does not eliminate society's expectation to be protected from the severe intrusion of having the government monitor private activities through hidden video cameras." *Id*.

The circumstances before the Court are different in kind from the circumstances in the cases cited by the USAO: *United States v. Jackson*, 213 F.3d 1269 (10th Cir. 2000), *vacated on other grounds*, *Jackson v. United States*, 531 U.S. 1033 (2000); and *United States v. Vankesteren*, 553 F.3d 286 (4th Cir. 2009). In *Jackson*, the Tenth Circuit upheld law enforcement's use of video surveillance from a pole camera to record the front of the defendant's home in Elk City, Oklahoma. The defendant's home in *Jackson* was on a public street, and there was no meaningful analysis as to the impact of the *prolonged* nature of the video surveillance. 213 F.3d at 1280-81. In *Vankesteren*, the Fourth Circuit permitted the warrantless use of video surveillance from a pole camera to "view" defendant's bird-trapping conduct on fields which were located more than a mile from his home. 553 F.3d at 287-88 (4th Cir. 2009). And fairly recently, an Arizona District Court found that law enforcement did not conduct a search by obtaining permission of a neighboring business to install a video camera to continuously record the happenings in the adjacent apartment complex's fenced parking lot because a passerby could observe the happenings if he was in either the

parking lot or outside the complex through the iron fence's openings. *United States v. Brooks*, 911 F. Supp. 2d 836, 843 (D. Ariz. 2012).

The facts involved in these three cases are different from those before the Court.  Here, the video camera recorded the activities in Mr. Vargas' partially fenced, rural front yard for six weeks: this is not a public or urban setting.[11]  *See Oliver*, 466 U.S. at 178 ("[A]n individual may . . . legitimately demand privacy for activities conducted . . . in the area immediately surrounding the home.").  Mr. Vargas had a "'constitutionally protected reasonable expectation of privacy'" to not have his front yard continuously recorded by a surreptitiously placed video camera on a distant telephone pole that could zoom to view the activities occurring in his front yard for six

---

[11]  Video cameras are commonly used by law enforcement in public places.  *See also* Opinion, *Terrorism Forces Us to Rethink Use of Surveillance*, The Olympian, May 9, 2013, *available at* http://www.theolympian.com/2013/05/09/2538441/ terrorism-forces-us-to-rethink.html (discussing polling results showing approximately 80 percent of respondents favor surveillance by camera of public places);  Jerry Ratcliffe, Center for Problem-Oriented Policing, *Video Surveillance of Public Places* (2006), *available at* http://www.popcenter.org/responses/video_surveillance; Andrea Noble, *Public Surveillance from Private Property Questioned*, The Washington Times, Feb. 5, 2012 (discussing the use of video cameras by a private neighborhood association in order to deter crime by taping public spaces such as streets and sidewalks).  Mr. Vargas' front yard is not a public place.

weeks. *Ciraolo*, 476 U.S. at 211 (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). Absent Mr. Vargas' May 2 and 6, 2013 target practice, how long the video camera would have remained operational is unknowable. The reasonableness of the expectation that one would not be observed and recorded in Mr. Vargas' front yard by a covert video camera is underscored by law enforcement's decision to shift the view of the camera during the execution of the search warrant.

Because the invasive and continuous manner in which the video camera was used for six weeks to surreptitiously record Mr. Vargas' front yard clearly violates Mr. Vargas' Fourth Amendment right to be free from unreasonable search, whether the video camera is or is not "in general public use" is immaterial to the Court's Fourth Amendment analysis. *Cf. Kyllo v. United States*, 533 U.S. 27, 34 (2001) (obtaining information regarding conduct inside a home through the use of technology that is not in general public use is a search); *Dow Chem. Co. v. United States*, 476 U.S. 227, 238 (1986) (recognizing that "surveillance of private property by using highly sophisticated surveillance equipment not generally available to the public, such as satellite technology, might be constitutionally proscribed absent a warrant"). Further, given the continued advancement of technology and reduction of cost in "old technology," the "in general public use" doctrine may lose viability: but this is a question for a different day. Colin Shaff, *Is the Court Allergic to Katz? Problems Posed by New Methods of Electronic Surveillance to the "Reasonable-Expectation-of-Privacy" Test*, 23 S. Cal. Interdisc. L.J. 409, 448 (Winter 2014) (questioning

1  the *Katz* test and suggesting that "although new surveillance

2  technologies may be superficially similar to preceding technologies,

3  modern technology can produce a detailed and broad picture of an

4  individual, entailing a very different violation of privacy than did

5  the earlier technology").

6      In summary, the severe governmental intrusion into Mr. Vargas'

7  privacy was an unreasonable search.[12]  *See Nerber*, 222 F.3d at 600

8  (encouraging courts to consider the severity of the governmental

9  intrusion when assessing whether an individual has a reasonable

10 expectation of privacy).  Because a warrant was not obtained to install

11 and operate the video camera, and the USAO has not proffered any

12 exception to the warrant requirement, the evidence obtained from the

13 video surveillance is suppressed as the Fourth Amendment "requires

14 adherence to judicial processes and . . . searches conducted outside

15 the judicial process, without prior approval by judge or magistrate,

16 are per se unreasonable under the Fourth Amendment — subject only to a

17 few specifically established and well-delineated exceptions." *Katz*,

18 389 U.S. at 357 (internal citations and quotations omitted); *see also*

19 *Riley*, 134 S. Ct. at 2482 ("Such a warrant ensures that the inferences

20 to support a search are 'drawn by a neutral and detached magistrate

21 _____

22 [12]  A search warrant obtained for silent video surveillance must comply with

23 the standards set forth in *United States v. Koyomejian*.  970 F.2d 536, 542

24 (9th Cir. 1992) (adopting four requirements, in addition to the probable-

25 cause requirement, that a warrant seeking permission to conduct silent video

26 surveillance must meet).  *See also* Fed. R. Crim. P. 41(b).

instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.'" (internal citation removed)); *Payton v. New York*, 445 U.S. 573, 585 (1979) ("Unreasonable searches or seizures conducted without any warrant at all are condemned by the plain language of the" Fourth Amendment.).   In addition, because the search warrant subsequently obtained on May 14, 2013, to search Mr. Vargas' home and property was based on the information obtained from the video surveillance, the evidence discovered pursuant to the execution of the search warrant is suppressed.[13]   *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) ("fruit of the poisonous tree").

**C.   Conclusion**

For the above-given reasons, **IT IS HEREBY ORDERED**:  Defendant's Motion to Suppress Evidence from Continuous Video Surveillance Pole Cam, **ECF No. 47**, is **GRANTED.**

**IT IS SO ORDERED.**  The Clerk's Office is directed to enter this Order and provide copies to counsel and the U.S. Probation Office.

**DATED** this ___15th___ day of December 2014.

s/Edward F. Shea
EDWARD F. SHEA
Senior United States District Judge

---

[13]  Because the evidence obtained from the use of the video camera is suppressed, the Court does not analyze whether the USAO has a duty under Federal Rule of Criminal Procedure 16(a)(1)(E)(i) and *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose the technical details of the video camera.